UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X
DONNA TODOVERTO and JEAN
MARTIN,

                        Plaintiffs,

       -against-

ROBERT A. McDONALD, in his official
capacity as SECRETARY OF THE
DEPARTMENT OF VETERANS
AFFAIRS,

                      Defendant.
-----------------------------------------------------X

**OPINION AND ORDER**

13 Civ. 4922 (JCM)

     Plaintiffs Donna Todoverto ("Todoverto") and Jean Martin ("Martin") (collectively,

"Plaintiffs") commenced this action pursuant to the Age Discrimination in Employment Act, 20

U.S.C. § 623 ("ADEA"), against defendant Robert A. McDonald ("Defendant"), in his official

capacity as secretary of the United States Department of Veterans Affairs ("VA"), alleging that

they were subjected to disparate treatment and a hostile work environment on the basis of age.

(Docket No. 8).[1]  Presently before this Court is Defendant's motion for summary judgment

pursuant to Rule 56 of the Federal Rules of Civil Procedure.[2]  (Docket No. 48).  Plaintiffs oppose

the motion. (Docket No. 58).  For the reasons that follow, Defendant's motion is granted.

---

[1] The Second Amended Complaint ("SAC") names three different defendants and characterizes this matter as a class action. (Docket No. 8).  By Stipulation and Order of Partial Dismissal dated July 1, 2015, this Court dismissed the original three defendants, named Mr. McDonald as the proper defendant, and dismissed the portion of the SAC that purported to assert class action claims. (Docket No. 41).

[2] This action is before this Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 21).

## I. BACKGROUND

### A. Facts

The following facts are gathered from Defendant's statement filed pursuant to Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rules"),[3] Defendant's declarations and exhibits,[4] and the pleadings submitted by the parties in support of their contentions.  The facts are construed in the light most favorable to Plaintiffs as the parties opposing summary judgment.

### i. Plaintiffs' Employment at the VA

At all times relevant to this lawsuit, Plaintiffs were registered nurses over the age of 40 who were employed by the Urgent Care Unit ("Urgent Care") of the VA Hudson Valley Health Care System ("HVHCS").  Urgent Care has at least two campuses: one in Montrose, New York and one in Castle Point, New York. (Todoverto Dep.[5] at 22-23, Martin Dep.[6] at 36).

Todoverto was born in 1957 and worked for Urgent Care from 1996 until September 2013. (Todoverto Dep. at 9, 13, 20; SAC ¶ 5; Russell Decl.[7] ¶ 5).  She was working as a Level II staff nurse at Urgent Care from 2011 through September 2013. (Todoverto Dep. at 24).  In September 2013, Todoverto left Urgent Care and began working in her current position at a VA community-based outpatient clinic in Goshen, New York, after applying for the position in May

---

[3] Plaintiffs did not file a Rule 56.1 counter-statement or statement of facts.  Therefore, where Defendant's cited materials support the factual assertions in Defendant's Rule 56.1 statement, the Court accepts these facts as true for the purposes of this Opinion and Order. *See* Section II, *infra*.

[4] Plaintiffs did not file any declarations or exhibits with their opposition brief.

[5] Refers to the deposition of Todoverto taken in this action. (Onazawa Decl. Ex. 1).

[6] Refers to the deposition of Martin taken in this action. (Onazawa Decl. Ex. 2).

[7] Refers to the Declaration of Dardanella Russell, Chief of Human Resources of HVHCS. (Docket No. 49).  In this declaration, Russell asserts that Todoverto and Martin began working for HVHCS in 1986 and 1985, respectively. (*Id.* ¶¶ 4-5).  It is unclear whether Plaintiffs held other positions within HVHCS before joining Urgent Care in 1996. In any event, Plaintiffs' exact start dates with the VA are not relevant to the Court's analysis.

2013. (*Id.* at 20-21, 224).  Martin was born in 1960 and began working as a staff nurse for Urgent Care in 1996. (Martin Dep. at 27, 35).  She was working as a Level II staff nurse at Urgent Care from 2011 through May 2015. (*Id.* at 38).  Martin applied for and has been on paid sick leave from May 2015 to the present. (*Id.* at 38, 59; Russell Decl. ¶ 4).

The record indicates that there were seven other Level II staff nurses working for Urgent Care during the relevant time period: Linda Dahowski (born 1943); Carolyn Scolaro (born 1980); Karen Kearney (born 1951); Joann Callanan (born 1948); John Reynolds (born 1965); Kevin Burgher (born 1958); and Maureen Kennedy (born 1953). (Russell Decl. ¶¶ 12-15; Onazawa Decl.[8] Ex. 4; Martin Dep. at 45-50).  Six of these seven nurses—all except Scolaro— were over the age of 40 at all times relevant to this lawsuit. (Russell Decl. ¶¶ 12-15).  Kearney, Dahowski and Callanan retired from federal service in 2012, 2013 and 2014, respectively. (*Id.* ¶¶ 13-14, 17).

## ii.  Martir's Alleged Discriminatory Comments About "Old" and "Seasoned" Nurses

Plaintiffs claim that their supervisor Jose Martir ("Martir") repeatedly made discriminatory comments about their ages.

Martir became the Nurse Manager at Urgent Care and Plaintiffs' immediate supervisor in January 2011, (Martir[9] Decl. ¶ 1, Todoverto Dep. at 23, Martin Dep. at 53), and he began making derogatory statements about the "old staff" shortly thereafter, (Martin Dep. at 69, 72-73).  Martin kept handwritten notes of Martir's statements because she thought that "his behavior was just absolutely unbelievable." (*Id.* at 72).  In one entry dated February 2011, Martin wrote that Martir had said "I don't need to be told what to do by the old staff." (*Id.* at 72-73).  Martin understood

---

[8] Refers to the Declaration of Tomoko Onazawa. (Docket No. 52).

[9] Refers to the Declaration of Jose Martir. (Docket No. 51).

Martir to be using the term "old staff" to refer to certain individuals as "old" and said he used the term to refer to herself and "perhaps people who had been there longer than him." (*Id.* at 73). Around March 2011, while introducing himself to Plaintiffs and other Urgent Care staff, Martir stated that "the nursing administration says I can do whatever I want and we're going to get rid of all the old staff and bring in the new staff." (Todoverto Dep. at 48-50). Todoverto was "shocked" but did not report the comment to anyone. (*Id.* at 50). During a staff meeting on March 6, 2012, Martir told the Urgent Care nurses that the VA administration had instructed him to "get rid of the old nurses" and to replace them with "young blood," and that he had the "power to do it." (Martin Dep. at 65-67, 76-77). Todoverto recalls Martir making similar statements "in front of multiple people on multiple occasions." (Todoverto Dep. at 49). According to her, Martir made these statements "intermittently over the two years that [she] was there," *i.e.*, "[e]very couple of months." (*Id.* at 51). Martin states that Martir made these types of comments "many, many times," including during other meetings. (Martin Dep. at 65, 77).

Martir began calling the nurses "seasoned" in early 2012. According to Todoverto, Martir stopped calling her "old" and started calling her "seasoned" in a "very condescending" way after she filed an employment discrimination complaint with the VA in May 2012.[10] (Todoverto Dep. at 53-55, Onazawa Decl. Ex. 13). She stated that Martir would use the term anytime they were talking about staffing, and that he would say, for example, "I need a seasoned nurse here." (Todoverto Dep. at 57). She said "he thought it was a joke, you know, to talk about us like we're just garbage." (*Id.*). Todoverto could not recall how often Martir called her "seasoned" but said that Martir's comments "really upset" her. (*Id.*). According to Martin, she complained to Christine Andrews (Associate Chief of Nursing and Martir's immediate

---

[10] Todoverto stated that she filed the complaint in either March or April 2012. (Todoverto Dep. at 55). However, the complaint states that it was filed on May 18, 2012. (Onazawa Decl. Ex. 13).

supervisor), that she did not like being called "old," and afterwards, on or around March 20, 2012, Martir came in and said, "[h]ello . . . seasoned nurses . . . since I can't call you old." (Martin Dep. at 53-54, 90-91).  Martin assumed from this comment that Andrews had spoken with Martir about calling the nurses "old." (*Id.* at 91).  After that time, Martir called the nurses "old" less often, but he called them "seasoned" every day for a while—perhaps from March 2012 through May 2012—"[b]ecause he thought it was funny." (*Id.*).  Martin stated that after approximately May 2012, "it stopped" and Martir called the nurses "seasoned" infrequently. (*Id.* at 91-92).

### iii.  Alleged Discriminatory Actions against Todoverto

Todoverto also asserts that Martir engaged in discriminatory conduct against her in an effort to get rid of the "old staff."  First, she states that she was "written up" frequently, and was the only one written up, even though she had a stellar record prior to Martir becoming her supervisor. (Todoverto Dep. at 59-60, 69).  Second, she says that Martir would characterize her complaints as "personality conflicts" with other individuals. (*Id.* at 60, 69-73).  Third, she claims that Martir denied her requests to take Christmas vacation even when she submitted her requests ten to eleven months before Christmas. (*Id.* at 60, 74-76).  She does not know whether other people received preferential treatment in this regard. (*Id.* at 75-76).  Fourth, she asserts that she was the only staff member from Montrose that was ordered to report to Castle Point when that location had a staff shortage, and that she was sent there thirty times in a five- to six-month period. (*Id.* at 65-66).  Fifth, she notes that Martir rated her "satisfactory" on all three job-related categories on an annual proficiency report for the period August 2011 to August 2012 (the "2011-2012 Annual Evaluation"). (*Id.* at 177-78, Onazawa Decl. Ex. 7).  Todoverto considered this to be a negative review and refused to sign the report, but she eventually signed it after

Martir changed her rating to "high satisfactory" in two of the three categories. (Todoverto Dep. at 179-180, Onazawa Decl. Ex. 8).

There are no records of formal discipline in Todoverto's official personnel file. (Russell Decl. ¶ 5). However, Martir also maintained a private file with records of informal discipline for each of his employees, (Martir Dep.[11] at 23), and the record shows that Todoverto received three verbal counseling memoranda from Martir, a proposed reprimand from Martir, and a written counseling letter from Andrews.

The first verbal counseling memorandum, dated March 26, 2012, concerns an incident in which a patient came to Urgent Care complaining of a headache and mental confusion. (Martir Decl. Ex. 1). According to the memorandum, Todoverto had triaged the patient, incorrectly categorized him as a level 3 patient instead of a level 2 patient, and instructed him to wait in the waiting room without informing a medical provider of his symptoms. (*Id.*). The memorandum stated that this delay "could have resulted in severe adverse patient health outcomes" for the patient. (*Id.*). As a result, Martir required Todoverto to review the Urgent Care Triage Protocol and to complete additional training. (*Id.*). The memorandum stated that it was "not a form of disciplinary action and [would] not be placed in [Todoverto's] Official Personnel Folder" but that Martir would "hold it as a reminder of this counseling for a period of six (6) months." (*Id.*). The memorandum also noted that Todoverto's failure to improve her triage accuracy could "result in disciplinary action in the future." (*Id.*). Regarding this incident, Todoverto stated that she had correctly categorized the patient, who was "alert" and "oriented" when she saw him, and that she did inform a medical provider of his symptoms by placing information on the

---

[11] Refers to the deposition of Martir taken in this action. (Onazawa Decl. Ex. 3).

appropriate board. (Todoverto Dep. at 124-25, 130-31).  She also stated that many other nurses made triaging errors but were never disciplined. (*Id.* at 134).

The second verbal counseling memorandum is dated April 18, 2012. (Martir Decl. Ex. 2). In this memorandum, Martir wrote that a patient felt Todoverto had indirectly called her a "liar" by questioning the patient's "motive for seeking care" and noted that "any abuse of patients . . . can be punishable with a reprimand or discharge." (*Id.*).  The memorandum also stated that it was "not a form of disciplinary action and [would] not be placed in [Todoverto's] Official Personnel Folder" but that Martir would "hold it as a reminder of this counseling for a period of six (6) months." (*Id.*).  According to Todoverto, she had to ask this particular patient a lot of questions because the patient had many issues, and the patient was fine with her but afterwards filed a complaint alleging that Todoverto had called her a liar. (Todoverto Dep. at 143).  The patient then told Martir that Todoverto had not really called her a liar, but Martir wrote this verbal counseling memorandum anyway. (*Id.* at 144).  Todoverto stated that it is not normal for staff to be written up after it becomes clear that a patient has not made a valid complaint, that she was not aware of any other nurses who got similar write-ups, and that she believed this was "another thing that [Martir] was doing to add to [her] file to . . . make that basket so big [she could not] get rid of it." (*Id.* at 145).

The third verbal counseling memorandum is dated August 3, 2012. (Martir Decl. Ex. 3). In this memorandum, Martir wrote that a patient had learned that there was no medical provider available at Urgent Care on a certain day because Todoverto had been discussing the situation in front of the patient. (*Id.*).  Martir wrote that the content of the discussion was inappropriate, as

was Todoverto's tone and body language. (*Id.*).[12]  The memorandum stated that it was "not a form of disciplinary action and [would] not be placed in [Todoverto's] Official Personnel Folder" but that Martir would "hold it as a reminder of this counseling for a period of six (6) months." (*Id.*).  Regarding this incident, Todoverto noted that VA policy states that nurses do not have the authority to accept patients. (Todoverto Dep. at 148, 171-73).  According to her, the patient had been upstairs in primary care with his doctor, and when a primary care nurse brought the patient downstairs, she told the nurse that they did not have a doctor available to accept the patient. (*Id.* at 147, 151).  She does not think that that was wrong. (*Id.* at 151, 159).

Martir also issued Todoverto a proposed reprimand dated May 17, 2013. (Martir Decl. Ex. 5).  In this proposed reprimand, Martir stated that Todoverto was working in Montrose when he asked her to report to Castle Point due to a staff shortage. (*Id.*).  According to the memorandum, Todoverto did not report to Castle Point and later refused Martir's direct order to do so. (*Id.*).  Martir therefore charged Todoverto "with refusal to carry out a proper order from a supervisor." (*Id.*).  The proposed reprimand stated that Andrews would make the final decision as to any reprimand. (*Id.*).  By written counseling letter dated June 27, 2013, Andrews stated that Todoverto's actions in refusing to go to Castle Point were "not consistent with patient centered care" and noted that failure "to comply with orders in the future may result in disciplinary action." (Onazawa Decl. Ex. 6).  The letter also stated that it was "not a form of disciplinary action and [would] not be placed in [Todoverto's] Official Personnel Folder" but that Andrews would "hold it as a reminder of this counseling for a period of six (6) months." (*Id.*).

---

[12] Another VA employee, Shannen Szilva, wrote a report about this incident and noted that the patient "was upset by how the situation was talked about in front of him." (Martir Decl. Ex. 4).  Todoverto states that this was "all conjecture on her part." (Todoverto Dep. at 159).

Regarding this incident, Todoverto stated that Martir could have asked other staff to report to Castle Point but that "[i]t was obvious that he was picking on [her]" and that he did so because she "was the oldest person there and he said frequently he's going to get rid of the old staff." (Todoverto Dep. at 111-12). She also said that Martir first asked her to "talk to the other staff and see who wants to go," but that the other two nurses on duty, Callanan and Reynolds, would not go. (*Id.* at 105, 110). She eventually left for Castle Point after Martir told her that she had to, but her car got a flat tire on the way and she did not end up making it there. (*Id.* at 104-106, 111). Todoverto then visited her union representative and obtained time sheets showing that she reported to Castle Point thirty times over a five- to six-month period while Callanan and Reynolds—who were also over the age of 40—did not go to Castle Point at all. (*Id.* at 66).[13] After her union representative informed Martir that Todoverto was the only nurse traveling to Castle Point, Martir created a schedule so that Callanan and Reynolds would also be assigned to cover staffing needs in Castle Point. (*Id.* at 69). While the other two nurses often "didn't end up going" to Castle Point, Todoverto also "didn't have to go after that conversation with him." (*Id.* at 66-69).

**iv. Alleged Discriminatory Actions against Martin**

Martin also alleges several instances of discriminatory conduct. First, she asserts that she was "assaulted by a patient as a result of Martir's failure to address safety concerns raised by her." (Opp.[14] at 2). Second, she states that Martir threatened to fire her after the patient assault. (Martin Dep. at 93, 125-26). Third, she complains that she received various counseling memoranda and letters of reprimand. (Opp. at 3-4, Martir Decl. Exs. 6-7, Russell Decl. Exs. 2-3).

---

[13] These time sheets are not part of the record before the Court.

[14] Refers to Plaintiffs' Memorandum of Law in Response to Defendant's Motion for Summary Judgment. (Docket No. 58).

Fourth, she claims that Martir denied her the opportunity to take time off work to complete mandatory online classes, go to committee meetings, and teach classes, while he allowed other nurses to take time off for personal obligations. (Martin Dep. at 223-228).

The assault incident occurred on or about March 21, 2012. (Martin Dep. at 93-94). On that day, Martin received a call from a staff nurse telling her that a suicidal patient would be coming in to Urgent Care to be medically cleared before being transferred to the Bronx for a psychiatric admission. (*Id.* at 93-95, 100). Martin called the VA police to alert them, pursuant to VA policy. (*Id.* at 94, 97-98). Martir and Callanan were in the psychiatric area, which is usually locked and segregated from the general waiting area, and were moving furniture in and out with the door "wedged open." (*Id.* at 94-97). Martin asked them to clean up the area because a psychiatric patient was on his way. (*Id.* at 94). After the patient arrived, he became agitated, pushed past Martin through a door in the psychiatric area that Martir had left unlocked, and ran out of the building. (*Id.* at 104-106). Martin pressed the panic alarm and gave chase, per VA policy. (*Id.* at 106). When Martin caught up with the patient, he grabbed her arm and refused to let go for several minutes. (*Id.* at 109). Eventually a female staff member asked Martin if she wanted her to call an emergency code, and the patient let go and ran when Martin said yes. (*Id.*). Martin followed the patient until the police intercepted him and brought him back to the psychiatric area. (*Id.*). The patient was sweating profusely and Martin asked Callanan for help taking care of him, but Callanan refused and said "I'm not getting assaulted." (*Id.* at 109-110).

Before this episode, other staff had been disciplined for incidents with patients in the psychiatric unit and Martir had said that "if another incident happened, . . . somebody would be fired." (Martin Dep. at 124, 126). After the episode, Martir told Martin that she "was going to be fired" and Martin walked away crying. (*Id.* at 125-26). Martir, however, never proposed any

formal discipline in connection with this incident. (*Id.*).  Martin went to Andrews complaining about Martir's lack of concern for the safety of patients and staff,[15] and Andrews said she was going to give Martir a write-up but Martin does not know if that ever occurred. (*Id.* at 82).  After the assault, Martin saw the patient who had assaulted her "all the time" and said he "followed [her] to the train station." (*Id.* at 137).  Martin went on paid sick leave in May 2015 as a result of the March 2012 assault. (*Id.* at 59).

After the assault, Martin received two records of informal discipline from Martir.  By memorandum dated May 2, 2012, Martir memorialized a conversation he claims to have had with Martin where he warned her that she would be marked Absent Without Leave ("AWOL") for her absences on approximately six days in April 2012 if she did not submit or resubmit a sick leave request for those days. (Martir Decl. Ex. 6).  He further wrote that she would not receive pay for any time indicated as AWOL and that her failure to submit proper sick leave requests "may result in disciplinary action, including termination." (*Id.*).  However, Martin maintains that the memorandum consisted of "bogus charges." (Martin Dep. at 164).  Under her version of events, Callanan had called Martin "on behalf of Mr. Martir" one morning telling her that she had been exposed to the flu and needed to stay home from work. (*Id.*).  She went to the doctor and faxed her doctor's note to Martir. (*Id.* at 163-64).  She also stated that she "never got the time back, and they didn't pay [her the] $40 for the Tamiflu" she had gotten from the doctor. (*Id.* at 167).

---

[15] Martin noted that Martir's unsafe actions included "leaving units unlocked, keys out, . . . [and] putting cabinets in front of panic buttons so [staff] couldn't get to them," (Martin Dep. at 82), and that other general safety issues included "VA [police officers] not remaining with veterans in the psychiatric area . . . not scanning veterans for contraband upon their arrival and having inexperienced [personnel] . . . assigned to remain with psychiatric patients," (*id.* at 140).  Martin says that she was "barricaded in" to a certain area after locks were changed, and that she "had several incidents of being assaulted." (*Id.* at 122).

The second record of informal discipline was a letter of written counseling dated August 15, 2012. (Martir Decl. Ex. 7). In this letter, Martir reported that Martin was "disrespectful and subordinate" to him when he asked her if she had attended a clinical orientation, and that she responded that she was not going to attend because Martir had not helped her with her claim. (*Id.*). The letter stated that Martin's conduct was "punishable by a reprimand or discharge." (*Id.*). It also stated that it was "not a form of disciplinary action and [would] not be placed in [Martin's] Official Personnel Folder," but that Martir would "hold it as a reminder of this counseling for a period of six (6) months." (*Id.*). Martin claims that this letter contains "made-up events." (Martin Dep. at 171). Under Martin's version of events, she spoke to Andrews about the fact that she was not being paid for her leave time related to being assaulted. (*Id.*). Andrews then told Martin that she could have time to work on her claim and that she would be asking Martir to help. (*Id.*). Martin says she did tell Martir that she was not going to attend the clinical orientation but ended up attending the orientation anyway. (*Id.* at 172-73).

Martin also received two letters of reprimand from Andrews in her official personnel file. The first is dated April 22, 2014 and indicates that Martin approached a VA police officer and told the officer that she wanted to "file a fucking complaint against [her] fucking boss who tried to get [her] fucking fired for taking photographs in there." (Russell Decl. ¶ 11, *id.* Ex. 2). The second is dated May 1, 2015 and asserts that Martin "left for the day, leaving a suicidal patient alone with a Nursing Assistant, without being properly relieved by another Registered Nurse," in violation of VA procedures. (*Id.* Ex. 3).

## B.  Procedural History

Todoverto filed a formal complaint of employment discrimination with the VA on or about May 18, 2012 and Martin filed a formal complaint of employment discrimination with the

12

VA on or about July 23, 2012. (Onazawa Decl. Exs. 13, 16).  Plaintiffs then voluntarily withdrew their administrative complaints to pursue a civil action. (*Id.* Exs. 14, 17).  Plaintiffs[16] commenced this action on July 16, 2013, filed a First Amended Complaint on August 19, 2013, and filed the Second Amended Complaint ("SAC") on April 18, 2014. (Docket Nos. 1, 2, 8).  Defendant filed the instant motion for summary judgment on November 16, 2015. (Docket No. 48).

## II.  SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure ("Federal Rules"), the moving party bears the burden of demonstrating that it is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  The Court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A genuine dispute as to a material fact "exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Beyer v. Cty of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008) (citation omitted); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247-48 (1986).  "A fact is material if it might affect the outcome of the suit under the governing law." *Casalino v. N.Y. State Catholic Health Plan, Inc.*, No. 09 Civ. 2583 (LAP), 2012 WL 1079943, at *6 (S.D.N.Y. Mar. 30, 2012) (citation omitted).  However, summary judgment—judgment as a matter of law—must be granted if the non-moving party fails to establish the existence of an essential element of the case and on which it bears the burden of proof at trial. *Celotex*, 477 U.S. at 322.

---

[16] Additional plaintiffs were also named in the Complaint and the First Amended Complaint. (Docket Nos. 1, 2). These individuals were not named in the Second Amended Complaint and have been terminated from the case.

In reviewing a motion for summary judgment, the Court "must draw all reasonable inferences in favor of the [non-moving] party" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150-51 (2000) (citations omitted).  However, the Court may not weigh the evidence or determine the truth of the matter. *Anderson*, 477 U.S. at 249.  Credibility determinations, the drawing of legitimate inferences from the facts, and evaluating ambiguous acts are functions of the jury, not the judge. *Reeves*, 530 U.S. at 150 (citation and quotation marks omitted); *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001).

"Summary judgment is inappropriate when the admissible materials in the record make it arguable that the claim has merit." *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (citations and quotation marks omitted).  Summary judgment should only be granted where "it is quite clear what the truth is." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 546 (2d Cir. 2010) (citation omitted).  However, a party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Celotex*, 477 U.S. at 324; *see also Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1389 (2d Cir. 1992) ("when the evidence offered in opposition to [a motion or cross-motion for summary judgment] is defective in form but is sufficient to apprise the court that there is important and relevant information that could be proffered to defeat the motion, summary judgment ought not to be entered.") (citation omitted) (alteration in original).  Rather, "[m]aterials submitted in support of or in opposition to a motion for summary judgment 'must be admissible themselves or must contain evidence that will be presented in admissible form at trial.'" *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169-70 (2d Cir. 2014) (citations omitted).  A court may consider inadmissible documents if the opposing party does not timely object. *Capobianco v. City of New*

*York*, 422 F.3d 47, 55 (2d Cir. 2005) ("[U]ncertified or otherwise inadmissible documents may be considered by the court if not challenged. The objection must be timely or it will be deemed to have been waived.") (citation omitted) (alteration in original).

In the Southern District of New York, parties moving for and opposing summary judgment motions must also submit short and concise statements of facts, supported by evidence that would be admissible at trial. Local Rule 56.1. The opposing party must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of the motion. Local Rule 56.1(c); *T.Y. v. New York City Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) ("A nonmoving party's failure to respond to a Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible."). However, "uncontested fact[s] cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement"—in the absence of citations or "where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." *Holtz*, 258 F.3d at 73 (quotation marks and citations omitted). Thus, the Court has discretion "to conduct an assiduous review of the record even where one of the parties has failed to file such a statement." *Holtz*, 258 F.3d at 73 (citations and quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(1)(B)(3).

## III. DISCUSSION

In the SAC, Plaintiffs each assert two claims under the ADEA: a disparate treatment claim and a hostile work environment claim. (SAC ¶¶ 1-2). In the instant motion, Defendant moves for summary judgment dismissing the SAC in its entirety. (Motion[17] at 30-31). Plaintiffs' claims are analyzed below.

---

[17] Refers to Memorandum of Law in Support of Defendant's Motion for Summary Judgment. (Docket No. 53).

**A.  Disparate Treatment**

Under their first theory of liability, Plaintiffs assert that Defendant subjected them to "a variety of adverse employment actions" because Plaintiffs were older workers and Defendant did not want them to continue working for the VA. (SAC ¶¶ 1-2).  Defendant argues that Plaintiffs' disparate treatment claims cannot withstand summary judgment. (Motion at 20-25).

**i.  Legal Standard**

The ADEA provides, in relevant part, that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a).  This provision is "limited to individuals who are at least 40 years of age." *Id.* § 631.

Courts in the Second Circuit analyze ADEA age discrimination claims under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Chapotkat v. Cty. of Rockland*, 605 F. App'x 24, 26 (2d Cir. 2015) (summary order).  Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802.  To establish a *prima facie* case of age discrimination, a plaintiff must show "(1) that she was within the protected age group, (2) that she was qualified for the position, (3) that she experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010) (citation omitted).  If the plaintiff meets this initial burden, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its challenged action. *McDonnell Douglas*, 411 U.S. at 802.  If the defendant does so, the burden shifts back to the plaintiff to show that the defendant's

explanation is a "pretext" for discrimination. *Id.* at 804.  At this third step in the analysis, the plaintiff "must prove, by a preponderance of the evidence, that age was the but-for cause of the challenged adverse employment action and not just a contributing or motivating factor." *Gorzynski*, 596 F.3d at 106 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009)) (quotation marks omitted).  A plaintiff may prove but-for causation "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (setting out the but-for causation standard in the Title VII retaliation context).

An "adverse employment action" is one that constitutes a "'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citations omitted).[18]  Such a change "must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" *Id.* (citation omitted).  Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Id.* (citation omitted).

**ii. Application**

Defendant concedes that Plaintiffs have established the first two elements of a *prima facie* case of age discrimination—*i.e.*, that Plaintiffs are members of a protected class and were qualified for the positions they held. (Motion at 21).  However, Defendant argues that Plaintiffs have failed to demonstrate the third and fourth elements—an adverse employment action and an inference of discrimination. (*Id.* at 21-25).  Defendant also argues that, even if Plaintiffs could

---

[18] In *Galabya*, the Second Circuit relied on a Title VII case to articulate the "adverse employment action" standard in the ADEA context and stated that "ADEA and Title VII claims are analyzed under the same legal framework." *Id.* at 640, 640 n.2 (citation omitted).

establish a *prima facie* case of age discrimination, their claims would still fail because the VA had "legitimate, nondiscriminatory reasons" for its challenged actions, and Plaintiffs cannot prove that age was the but-for cause of any of these actions. (Reply[19] at 1-2).  The Court agrees that Plaintiffs have failed to establish any adverse employment actions and therefore does not reach Defendant's additional arguments.[20]

As detailed in Sections I(A)(iii)-(iv), *supra*, Plaintiffs each claim that they experienced a number of adverse employment actions.[21]  Todoverto claims the following as adverse employment actions: (i) three verbal counseling memoranda, (Opp. at 3, Martir Decl. Exs. 1-3); (ii) a proposed reprimand that resulted in a written counseling letter, (Opp. at 3, Martir Decl. Ex. 5, Onazawa Decl. Ex. 6); (iii) the 2011-2012 Annual Evaluation with three ratings of "satisfactory" rather than "high satisfactory" (two of which were later changed to "high satisfactory"), (Todoverto Dep. at 184, 186; Onazawa Decl. Exs. 7, 8); (iv) Martir's characterizing her complaints as "personality conflicts" with other individuals, (Opp. at 3; Todoverto Dep. at 60, 69-73); (v) Martir's denial of her request for Christmas vacation time, (Opp. at 3; Todoverto Dep. at 60, 74-76); and (vi) Martir's assigning her to work in the Castle Point location of Urgent Care thirty times over a five- to six-month period, (Opp. at 6; Todoverto Dep. at 60, 65-66).

---

[19] Refers to the Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment. (Docket No. 59).

[20] Defendant further argues that the SAC should be dismissed in its entirety because Plaintiffs have failed to establish any recoverable damages. (Motion at 28-30).  Because the Court finds that summary judgment is warranted on other grounds, it declines to reach this issue.

[21] Plaintiffs only mention some of these claimed "adverse employment actions" in their opposition brief; they listed others during the deposition testimony that is part of the record before the Court.  The Court will analyze all of the asserted adverse employment actions in the record regardless of whether Plaintiffs included them in their opposition brief because "courts, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law." *Vt. Teddy Bear Co. v. 1–800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (citation and quotation marks omitted).

Martin asserts that the following constitute adverse employment actions: (i) two counseling memoranda, (Opp. at 3-4, Martir Decl. Exs. 6-7); (ii) two letters of reprimand that were placed in her official personnel file, (Russell Decl. Exs. 2-3); (iii) Martir's denial of her requests for personal time, (Opp. at 4, Martin Dep. at 223-228); (iv) Martir's "indifference to safety warnings" that allegedly led to the 2012 patient assault on Martin, (Opp. at 3, 6); and (v) Martir's threat to fire her after the 2012 patient assault, (Opp. at 3; Martin Dep. at 93, 125-26).

### a.  Letters of Reprimand, Counseling Memoranda, Annual Evaluation and Criticisms

Letters of reprimand and negative evaluation letters may be considered adverse employment actions in certain circumstances. *Lawrence v. Mehlman*, 389 F. App'x 54, 56 (2d Cir. 2010) (summary order).  However, "such appraisals must generally trigger other negative consequences to the terms and conditions of the plaintiffs [sic] employment in order to qualify as a materially adverse change" in the terms and conditions of employment. *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 254 (E.D.N.Y. 2012) (collecting cases), *aff'd*, 713 F.3d 163 (2d Cir. 2013).  As the Second Circuit has noted, "[i]t hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action." *Weeks v. New York State (Div. of Parole)*, 273 F.3d 76, 86 (2d Cir. 2001), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108–14 (2002).

Here, Plaintiffs have not presented any evidence that the letters of reprimand, counseling memoranda, 2011-2012 Annual Evaluation with three "satisfactory" ratings, or other criticisms triggered any negative consequences to the terms and conditions of their employment.  Most of the counseling memoranda stated that they were "not a form of disciplinary action" and would not be placed in Plaintiffs' official personnel folders. (*See* Martir Decl. Exs. 1-3, 7; Onazawa

Decl. Ex. 6).  In addition, the record shows that neither Todoverto nor Martin was ever terminated or suspended without pay, and neither received any reductions in their base pay, job titles or job responsibilities during their tenure at Urgent Care. (Todoverto Dep. at 28-29, 96, 98-99; Martin Dep. at 154, 287-89; Russell Decl. ¶¶ 4-5).

Plaintiffs assert in their opposition brief that they experienced "a decrease in pay" when they lost overtime opportunities. (Opp. at 7).  However, they do not argue that the letters of reprimand, counseling memoranda, 2011-2012 Annual Evaluation, or other criticisms *triggered*—or were in any way connected to—any such loss of overtime opportunities.  To the contrary, they assert that Todoverto lost overtime opportunities because she was commuting back and forth between Montrose and Castle Point. (*Id.*, Todoverto Dep. at 30).  Negative appraisals are not transformed into adverse employment actions simply because Plaintiffs may have experienced some other unrelated loss of benefits while they were working for Urgent Care. In addition, Plaintiffs make only a conclusory assertion that they lost overtime opportunities at all. *See* Section III(A)(ii)(b), *infra*.  This is insufficient to withstand a motion for summary judgment.[22]

Given these circumstances, the Court finds that Plaintiffs' negative appraisals did not constitute adverse employment actions. *See, e.g.*, *Weeks*, 273 F.3d at 86 (holding that a "notice of discipline" and a "counseling memo" did not constitute adverse employment actions where plaintiff "allege[d] no facts from which one could infer that the [two documents] created a

---

[22] A generous reading of the papers may suggest that Martin experienced a loss of benefits as a result of the May 2, 2012 memorandum from Martir, in which he warned her that she would not be paid for approximately six days of absences if she did not submit proper sick leave requests. (Martir Decl. Ex. 6).  When questioned about the memorandum in her deposition, Martin stated that she "never got the time back." (Martin Dep. at 167).  However, this conclusory statement is not clear enough for the Court to make any reasonable inference as to its meaning or to create a genuine dispute as to any material fact. *See Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment . . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (alterations in original) (citation omitted).

materially adverse change in her working conditions"); *Solomon v. Southampton Union Free Sch. Dist.*, No. 08–CV–4822 (SJF)(ARL), 2011 WL 3877078, at \*9 (E.D.N.Y. Sept. 1, 2011) (holding that a "negative evaluation" was not an adverse employment action where plaintiff "failed to provide *any* evidence that her negative evaluation affected her employment in any way") (emphasis in original); *Alywahby v. Shinseki*, Nos. 01–CV–6512 (NGG)(LB), 01–CV–9017 (NGG)(LB), 04–CV–2183 (NGG)(LB), 2009 WL 5166271, at \*6 (E.D.N.Y. Dec. 29, 2009) ("A performance evaluation that is 'Satisfactory,' without more, is insufficient to constitute a material adverse action.").  Plaintiffs attempt to distinguish this line of case law by arguing that they "maintained near perfect records before . . . Martir became their supervisor." (Opp. at 6).  However, even if true, this assertion is not relevant to the Court's analysis of whether or not the negative assessments in the record constituted adverse employment actions—and the Court finds that they did not.

**b.  Todoverto's Assignments to Work in Castle Point**

Todoverto's periodic assignments to work in Castle Point rather than Montrose also did not constitute adverse employment actions.  While "[a]n internal transfer can be an adverse employment action if accompanied by a negative change in the terms and conditions of employment," *Terry v. Ashcroft*, 336 F.3d 128, 144 (2d Cir. 2003) (citation and quotation marks omitted), "a forced transfer . . . is not an adverse employment action if the terms, privileges, duration, or condition of a plaintiff's employment do not change," *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (summary order); *see also Galabya*, 202 F.3d at 641 (affirming entry of summary judgment where plaintiff had not "produced evidence to show that the transfer was to an assignment that was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement.").

Here, Todoverto has not shown any evidence that her intermittent daily assignments to work in Castle Point rather than Montrose were accompanied by any negative change in the terms and conditions of her employment. She claims—without any citation—that Todoverto experienced a decrease in pay because "Martir only selected nurses from the Hudson Valley[23] campus where he was based for over time [sic], and not from Castle Point where he sent Todoverto over 30 times in a 5-6 month" period. (Opp. at 7). This conclusory allegation that Todoverto lost overtime opportunities is insufficient to establish an adverse employment action. *See Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 218 (E.D.N.Y. 2014) (no adverse employment action where plaintiff made "bare allegations" that she was denied the opportunity to earn overtime and that other staff received overtime assignments but "she could not provide any specific examples, and there [was] no other evidence in the record to support this claim"); *Hayle v. Nassau Health Care Corp.*, No. 08–CV–2396 (DRH)(GRB), 2013 WL 6231164, at *6 (E.D.N.Y. Dec. 2, 2013) ("Plaintiff's complaint that she was not able to get as much overtime as the other supervisors in her department is [insufficient to establish an adverse employment action] because it is comprised only of her own conclusory testimony."); *Turley v. ISG Lackawanna, Inc.*, 803 F. Supp. 2d 217, 236 (W.D.N.Y. 2011) (no adverse employment action where plaintiff did not "identify any instance where he was denied requested overtime work so that it could be given to others.").

Plaintiffs cite *Meder v. City of New York*, 2007 U.S. Dist. LEXIS 75400, at *19 (E.D.N.Y. Oct. 9, 2007), apparently for the proposition that a job reassignment can constitute an adverse employment action. (Opp. at 6). In *Meder*, the court found that the plaintiff's transfer from one teaching assignment to a "worse assignment" that "no other teacher wanted," and her

---

[23] The Court presumes that Plaintiffs mean to refer to the Montrose campus, where Martir was based. (Martir Decl. ¶ 1).

subsequent demotion to a "permanent substitute" teacher position, could constitute an adverse

employment action under the ADEA because the transfer and demotion were "accompanied by a

negative change in the terms of conditions of employment." *Id.* at *10-11, *20 (citation omitted).

In this case, by contrast, the record indicates that "[t]he only substantive difference between the

two positions was that the [Castle Point] position resulted in a longer commute-which is an

inconvenience, not an adverse employment action." *Smalls v. Allstate Ins. Co.*, 396 F. Supp. 2d

364, 371 (S.D.N.Y. 2005); *see also Weeks*, 273 F.3d at 86 (no adverse employment action where

plaintiff was transferred from one office to another and there was "no allegation that the

reassignment constituted a demotion or otherwise").  Therefore, Todoverto's assignments to

work in Castle Point did not constitute adverse employment actions.

### c.  Martir's Indifference to Safety Warnings

Martir's "indifference to safety warnings" also did not constitute an adverse employment

action.  Courts have held that "exposing a worker to dangerous or extreme work conditions may"

constitute an adverse employment action in certain circumstances. *McAllister v. Metro. Transit

Auth.*, No. 13–CV–2060 (JG), 2013 WL 4519795, at *6 (E.D.N.Y. Aug. 26, 2013) (finding that

defendant's refusal to fix an air conditioning unit in the booth where plaintiff worked, which led

to plaintiff "working in extreme temperatures despite his heart condition," could constitute an

adverse employment action); *see also, e.g.*, *Edwards v. Metro–North Commuter R.R. Co.*, No.

3:04cv1430 (JBA), 2006 WL 2790402, at *5 (D.Conn. Sept. 27, 2006) ("failure to provide

plaintiff with protective equipment which every other worker on plaintiff's gang had . . . could

constitute an adverse employment action because it exposed plaintiff to potentially unreasonably

dangerous working conditions").  However, not all exposures to unsafe working conditions

constitute adverse employment actions. *See, e.g.*, *Dhar v. NYC Dep't of Transp.*, No. 10–cv–

5681 (ENV)(VVP), 2014 WL 4773965, at *7 (E.D.N.Y. Sept. 24, 2014) (holding that plaintiff's

claim that he was "forced to conduct an inspection . . . in unsafe working conditions" was not

even "arguably" an adverse employment action), *aff'd sub nom. Dhar v. New York City Dep't of

Transp.*, 630 F. App'x 14 (2d Cir. 2015) (summary order).

Here, Martin noted that Martir's unsafe actions included "leaving units unlocked, keys

out, . . . [and] putting cabinets in front of panic buttons so [staff] couldn't get to them," (Martin

Dep. at 82), and that other general safety issues included "VA [police officers] not remaining

with veterans in the psychiatric area . . . not scanning veterans for contraband upon their arrival

and having inexperienced [personnel] . . . assigned to remain with psychiatric patients," (*id.* at

140).  Most notably, Martin claims that she was "assaulted by a patient as a result of Martir's

failure to address safety concerns raised by her." (Opp. at 2).  Specifically, Martin claims that a

psychiatric patient she was working with became agitated, pushed past her through a door that

Martir had left unlocked, and eventually grabbed her arm for several minutes. (Martin Dep. at

93-109).  After carefully reviewing the record, the Court finds that any potentially unsafe

conditions at the VA did not rise to the level of an adverse employment action.  Although Martin

asserts that she has experienced a great deal of distress from the patient assault, the Court cannot

agree that an unlocked door, even in combination with the other alleged safety issues, constituted

a "'materially adverse change' in the terms and conditions of [Martin's] employment." *Galabya*,

202 F.3d at 640.  Furthermore, there is absolutely no evidence in the record that any of these

safety issues "occurred under circumstances giving rise to an inference of [age] discrimination."

To the contrary, as Martin confirmed, they were "safety issues that affected all of the staff nurses

in urgent care," (Martin Dep. at 122), as well as "all the veterans," (*id.* at 141).

**d. Martir's Threat to Terminate Martin**

Threats of termination alone also do not constitute adverse employment actions. *See Tompkins v. Allied Barton Sec. Servs.*, No. 09 Civ.1954(RMB)(JLC), 2010 WL 3582627, at *5 n. 6 (S.D.N.Y. Aug. 2, 2010) ("Plaintiff appears further to claim that [a manager] threatened her with termination. The vast majority of courts in this circuit have held that a threat alone does not constitute an adverse employment action."), *aff'd,* 424 F. App'x 42 (2d Cir. 2011) (summary order); *Early v. Wyeth Pharms., Inc.*, 603 F. Supp. 2d 556, 574 (S.D.N.Y. 2009) ("A threat is not, by itself, an adverse employment action. Rather, an adverse employment action must affect ultimate employment decisions such as promotion, wages, or termination.") (citation and quotation marks omitted); *Bowles v. New York City Transit Auth.*, No. 00 Civ. 4213 BSJ MHD, 03 Civ. 3073 BSJ MHD, 2006 WL 1418602, at *10 (S.D.N.Y. May 23, 2006) ("In this Circuit, most courts that have faced the issue have decided that an unrealized threat of discipline or termination is not actionable under Title VII") (collecting cases).  Here, Martir's bare threat to fire Martin after the 2012 patient assault—which did not result in any type of adverse consequences or disciplinary action against her—did not constitute an adverse employment action.

**e. Martir's Denial of Requests for Vacation and Personal Time**

Finally, Martir's denial of certain of Plaintiffs' requests for vacation or personal time did not constitute an adverse employment action. *See, e.g.*, *Chukwuka v. City of New York*, 795 F. Supp. 2d 256, 261 (S.D.N.Y. 2011) ("In general, the denial of vacation time does not . . . rise to the level of an adverse employment action"), *aff'd*, 513 F. App'x 34 (2d Cir. 2013) (summary order); *Tompkins v. Allied Barton Sec. Servs.*, No. 09 Civ.1954(RMB)(JLC), 2010 WL 3582621, at *3 (S.D.N.Y. Sept. 13, 2010) ("the denial of two requests for time off does not constitute an

adverse employment action") (citation and quotation marks omitted), *aff'd sub nom. Tompkins v. AlliedBarton Sec. Servs.*, 424 F. App'x 42 (2d Cir. 2011) (summary order); *Roff v. Low Surgical & Med. Supply, Inc.*, No. CV–03–3655(SJF)(JMA), 2004 WL 5544995, at *4 (E.D.N.Y. May 11, 2004) ("the denial of a single vacation request, without any indication that there was an absolute prohibition against plaintiff taking any vacation time, is not a material adverse employment action."); *Boyd v. Presbyterian Hosp. in City of New York*, 160 F. Supp. 2d 522, 537 (S.D.N.Y. 2001) ("To the extent that Plaintiff also alleges that she was denied requests for vacation on Christmas, and that the denial constitutes an adverse employment action, this argument too is without merit.").

For the foregoing reasons, Plaintiffs have failed to meet their burden of establishing a *prima facie* case of age discrimination under the ADEA. Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiffs' disparate treatment claims.

## B. Hostile Work Environment

Under their second theory of liability, Plaintiffs assert that "Martir's numerous age discriminatory remarks coupled with the unjustified counselings and pervasive harassment of the Plaintiffs . . . subjected the Plaintiffs to a hostile work environment." (Opp. at 1). Defendant contends that Plaintiffs' hostile work environment claims cannot withstand summary judgment because Plaintiffs complain only of "sporadic" age-related comments and age-neutral acts. (Motion at 25-26).

### i. Legal Standard

To establish a hostile work environment claim under the ADEA, a plaintiff must show that "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Terry*, 336 F.3d at 147-48 (noting

that "[t]he same standards apply to hostile work environment claims brought under the ADEA" as under Title VII) (citations omitted); *see also Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 78 (1998) (stating that a hostile work environment is created "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment"). A plaintiff must prove that the environment was both objectively and subjectively hostile. *Terry*, 336 F.3d at 148 (citations omitted). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" *Id.* (citation omitted). When analyzing a hostile work environment claim, courts must examine "the totality of the circumstances." *Id.* Factors to be considered include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citation omitted).

In addition, a plaintiff must "demonstrate that she was subjected to the hostility because of her membership in a protected class." *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999); *see also Pronin v. Raffi Custom Photo Lab., Inc.*, 383 F. Supp. 2d 628, 634 (S.D.N.Y. 2005) ("Abusive conduct in the workplace, if not based on a protected class, is not actionable under . . . the ADEA."). Finally, a "plaintiff must show that 'a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000) (citations omitted).

ii. **Application**

Here, the record shows that Plaintiffs' hostile work environment claim is based upon: (i) Martir's comments that the VA was going to "get rid of all the old staff and bring in young staff"

and his referring to Plaintiffs as "old" and "seasoned;" (ii) Todoverto's receipt of three verbal counseling memoranda and a proposed reprimand that resulted in a written counseling letter; (iii) Todoverto's receipt of the 2011-2012 Annual Evaluation with three ratings of "satisfactory" rather than "high satisfactory," (iv) Martin's receipt of two counseling memoranda and two letters of reprimand; (v) Martir's denial of Plaintiffs' requests for vacation and personal time; (vi) Martir's characterizing Todoverto's complaints as "personality conflicts" with other individuals; (vii) Martir's assigning Todoverto to work in the Castle Point location of Urgent Care thirty times over a five- to six-month period; (viii) Martir's "indifference to safety warnings" that allegedly led to the 2012 patient assault on Martin; (ix) Martir's threat to fire Martin after the 2012 patient assault; and (x) Martir's maintenance of a private file with documents about Plaintiffs, which they claim "was an intimidation tactic whereby [Martir] hazed and harassed the Plaintiffs." (Opp. at 5; *see also* Sections I(A)(ii-iv), *supra*). After reviewing these circumstances as a whole, I conclude that Plaintiffs' hostile work environment claim cannot withstand summary judgment.

As an initial matter, Martir's "indifference to safety warnings" cannot support a hostile work environment claim because no reasonable juror could find that Plaintiffs were subjected to unsafe conditions because of their ages. *See Brennan*, 192 F.3d at 318 ("an environment which is equally harsh for . . . both young and old does not constitute a hostile working environment under the [ADEA]."). Martin testified that the safety issues affected all of the staff nurses and all of the patients at Urgent Care, (Martin Dep. at 122), and there is no evidence in the record to suggest that Martir created any safety issues in an effort to intimidate or harass Plaintiffs on the

basis of age.  Therefore, the Court will not consider this item in the remainder of its hostile work environment analysis.[24]

Turning to the frequency of the alleged discriminatory conduct, *see Terry*, 336 F.3d at 148, Martin stated that Martir called the older nurses "seasoned" on a daily basis for a few months—from March 2012 to approximately May 2012. (Martin Dep. at 91-92).  While these daily comments can certainly be considered frequent, they simply were not offensive enough to be considered "pervasive" in the context of a hostile work environment claim. *See Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000) ("The offensiveness of the individual actions complained of is . . . a factor to be considered in determining whether such actions are pervasive") (citation omitted).

The rest of the alleged discriminatory conduct occurred on an infrequent basis.  The counseling memoranda, letters of reprimand, 2011-2012 Annual Evaluation, denial of requests for vacation and personal time, and threat to fire Martin were all isolated incidents that took place sporadically over the course of two-and-half years (for Todoverto) or four years (for Martin).  Todoverto was required to work in Castle Point intermittently for a limited period of time—approximately once a week for five or six months.  Further, Todoverto indicates that Martir talked about getting rid of the "old" nurses "every couple of months" and Martin states that he made these comments "many, many times" over the course of her time at Urgent Care. (Todoverto Dep. at 51; Martin Dep. at 65, 77).  Such allegations are not sufficient to support a claim for a hostile work environment. *See, e.g.*, *Almontaser v. New York City Dep't of Educ.*, No.

---

[24] The Court expresses no opinion as to whether any of the other allegedly hostile acts—many of which were particular to Todoverto or Martin—occurred because of Plaintiffs' ages.  The Court declines to reach this issue given that Plaintiffs' hostile work environment claim fails on other grounds.  The Court simply notes that there is no evidence in the record to support a claim that the safety issues—which affected everyone at Urgent Care—occurred because of Plaintiffs' ages.

13 CV 5621(ILG)(VMS), 2014 WL 3110019, at *8 (E.D.N.Y. July 8, 2014) (no hostile work environment where plaintiff's supervisors "'frequently' told plaintiff '[y]ou're too old' and asked when he was going to retire") (alteration in original); *Aiello v. Stamford Hosp.*, No. 3:09cv1161(VLB), 2011 WL 3439459, at *7 (D. Conn. Aug. 8, 2011) (no hostile work environment where, among other things, plaintiff was called "'old man' several times a week"), *aff'd*, 487 F. App'x 677 (2d Cir. 2012) (summary order).

In addition, the record shows that the alleged harassment was not severe, was not physically threatening or humiliating, and did not unreasonably interfere with Plaintiffs' work performance. *See Terry*, 336 F.3d at 148.  There is no evidence in the record to support Plaintiffs' conclusory claim that "[t]he existence of Martir's private file created a hostile work environment, above and beyond a mere inconvenience." (Opp. at 9).  To the contrary, the undisputed record shows that Martir maintained a private file with records of informal discipline for each of his employees, regardless of their ages. (Martir Dep. at 23).  Further, the majority of Plaintiffs' complaints concern everyday criticisms, annoyances and inconveniences and they are, therefore, insufficient to establish a hostile work environment claim. *See, e.g.*, *Danzy v. Chao*, 177 F. App'x 133, 135 (2d Cir. 2006) (summary order) ("[Plaintiff] failed to make out a hostile work environment claim as the actions she alleged concerned only annoyances and personal disagreements and are therefore insufficient to show that her work environment 'was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered.'") (citation omitted); *Marcus v. Barilla Am. NY, Inc.*, 14 F. Supp. 3d 108, 113 (W.D.N.Y. 2014) ("Although plaintiff peppers her complaint with the words, 'threaten,' 'intimidate,' 'humiliate' and 'harass,' the actual conduct she describes—a series of sporadic, isolated incidents in which managers verbally disagreed with plaintiff or

criticized her job performance—falls well short, as a matter of law, of describing discriminatory conduct that is objectively threatening, intimidating, humiliating or harassing"). While Plaintiffs were clearly upset by Martir's conduct, their hostile work environment claims must fail because the record does not support the assertion that the environment was "objectively hostile." *Conklin v. Cty. of Suffolk*, 859 F. Supp. 2d 415, 426 (E.D.N.Y. 2012) ("While [Plaintiff] may have subjectively found the behavior to be harassing, that does not end the relevant inquiry because the conduct must be objectively hostile as well. There is no doubt that [Plaintiff's] employment situation may have been unpleasant, but this does not rise to the level of an illegal hostile environment.").

After considering the totality of the circumstances and drawing all reasonable inferences in favor of Plaintiffs, the Court holds that no reasonable juror could find that the harassment alleged here was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Terry*, 336 F.3d at 147-48 (citation omitted). Accordingly, the Court grants Defendant's motion for summary judgment as to Plaintiffs' claims for hostile work environment under the ADEA.

## IV.   CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in its entirety. The Clerk is respectfully requested to terminate the pending motion (Docket No. 48) and close the case.

Dated:   July 7, 2016
      White Plains, New York

                                      **SO ORDERED:**

                                      JUDITH C. McCARTHY
                                      United States Magistrate Judge